**CUNEO PRESS OF NEW ENGLAND, INC., Plaintiff,**

v.

**W. Marvin WATSON, Postmaster General of the United States, and Ephraim Martin, Postmaster, Boston, Massachusetts, Defendants.**

**The COLONIAL PRESS, INC., Plaintiff,**

v.

**W. Marvin WATSON, Postmaster General of the United States, and Thomas Joseph Mason, Postmaster, Clinton, Massachusetts, Defendants.**

Civ. A. Nos. 68–914–J, 68–915–J.

United States District Court
D. Massachusetts.

Nov. 25, 1968.

Warren F. Farr, Ropes & Gray, Boston, Mass., for Cuneo Press of New England, Inc.

Charles Donelan, Bowditch, Gowetz & Lane, Worcester, Mass., for the Colonial Press, Inc.

Paul F. Markham, U. S. Atty., Stanislaw R. J. Suchecki, Asst. U. S. Atty., for defendants.

### COURT'S ACTION ON REQUESTS FOR A PRELIMINARY INJUNCTION

JULIAN, District Judge.

These are two essentially identical civil actions brought by two separate book manufacturers contesting the legality of a postal regulation which imposes certain preconditions of mailability on fourth-class mail matter presented in bulk to the Post Office Department. The effect of the regulation is to require mailers of fourth-class mail in quantities of 1,000 or more pieces in a single day to sort the items in terms of destination according to stated standards.

On October 16, 1968, this Court denied plaintiffs' requests that a three-judge district court be convened to consider their contentions that the postal regulation in question [1] and the enabling statute under which it was enacted [2] were unconstitutional and should therefore be enjoined. At that time the Court ruled that the constitutional arguments concerning the statute were insubstantial. With regard to the issues raised concerning the postal regulation itself, however, the Court held only that the three-judge court requirement of 28 U.S.C. § 2282 was inapplicable. Thus plaintiffs were not foreclosed from pressing their challenges to the postal regulation before the single judge.

Following a four-day delay requested by defendants, the Court on October 18, 1968, received evidence and heard arguments by all parties on plaintiffs' motions for temporary restraining orders. Thereafter, at defendants' request, the Court granted a further extension of time to and including October 25, 1968, to enable defendants to submit additional material in support of their opposition to the motions. In view of these ample extensions of time and in view of the full opportunity accorded to all parties to present evidence, argue and submit briefs, the Court herein deals not only with plaintiffs' requests for temporary restraining orders but also with their requests for preliminary injunctions. Rule 65(a) (1), Federal Rules of Civil Procedure.

Both plaintiffs are Massachusetts corporations engaged in the business of printing, binding and shipping books and other printed matter to publishers and the general public. A major portion of the business of both plaintiffs involves the manufacture and mailing of books to individual member-subscribers of various book clubs. Book club business is a highly competitive branch of the book manufacturing industry in which small cost differentials and prompt adherence to mailing timetables are major competitive factors.

Both plaintiffs mail large numbers of books to individual addressees at special fourth-class rates. In the year ending June 30, 1968, plaintiff Colonial Press, Inc. (Colonial) made 2,413,276 such mailings,[3] and it expects to complete an additional 959,400 orders between this time and the end of 1968.[4] The fourth-class individual mailings by plaintiff Cuneo Press of New England, Inc. (Cuneo), while not so large as Colonial's, are likewise substantial.

Prior to October 1, 1968, the effective date of the challenged regulation, the Post Office maintained three detached mail units at Colonial's plant in Clinton, Massachusetts. The Post Office under-

---

1. Postal Regulation 135.2(a) (6), 33 Fed. Reg. 11359 (1968), published August 9, 1968.

2. Section 108(a) (6) of the Postal Revenue and Federal Salary Act of 1967, Pub.L. 90–206, 81 Stat. 620, 39 U.S.C. § 4554(e).

3. Affidavit of Donald P. Steele, Regional Director, Boston Region, U. S. Post Office Department.

4. Testimony of Robert R. Hackford, Executive Vice President and General Manager of Colonial.

took to furnish as many postal employees, sometimes amounting to as many as fifteen people, as Colonial's continually changing volume required. These postal employees customarily received cartons of mailing labels supplied by the book club, sorted the labels by hand in numerical order according to ZIP codes, and delivered them to Colonial's employees. Colonial's labeling crew would then affix the labels to the individually packaged books moving along a conveyor belt which delivered them to the detached mailing unit, whereupon the postal employees placed the packages in mail sacks.

Cuneo's mailing operation, prior to the October first effective date of the regulation, consisted of deliveries by truck to the South Postal Annex in Boston of unsorted bulk quantities of individually addressed books which were sorted and separated by postal employees. At least one and sometimes as many as three or four daily truckloads were delivered in this manner.

In December 1967 Congress enacted the Postal Revenue and Federal Salary Act of 1967, Pub.L. 90,206, 81 Stat. 620, effective January 7, 1968. Section 108(a) (6) of that Act, 39 U.S.C. § 4554(e), authorized the Postmaster General to prescribe the manner of preparation for mailing of items which were to be mailed at preferred fourth-class book rates in quantities of 1,000 pieces or more in a single mailing. The statute provided:

"(e) Articles may be mailed under this section in quantities of one thousand or more in a single mailing, as defined by the Postmaster General, only in the manner directed by him."

Pursuant to that authority, the Postmaster General enacted the regulation here challenged, Postal Regulation 135.2(a) (6), 33 Fed.Reg. 11359.[5] The effect of the regulation has been to require plaintiffs to perform through their own employees the sorting and packing previously done by postal employees.[6]

Both plaintiffs contend that the regulation exceeds the scope of the power conferred upon the Postmaster General in 39 U.S.C. § 4554(e) in that the regulation defines a "single mailing" as encompassing all identical[7] items presented for mailing "in a single day." This results, they argue, in their having to pre-sort all pieces in all shipments, including shipments of less than 1,000 identical pieces, whenever the combined daily total of all such shipments exceeds 1,000 pieces. Despite the authority given to the Postmaster General to define a "single mailing," plaintiffs contend that language does not permit a definition which includes "multiple mailings."

Plaintiffs also argue that the regulation, by imposing the costs of pre-sorting upon mailers, produces a disguised increase in special fourth-class postal

---

5. "§ 135.2 Classification.
   "(a) Description * * *"
   "(6) Pieces which are identical, presented in quantities of 1,000 or more in a single day for mailing * * * must be separated by the mailer and placed in sacks as follows:
   "(i) When there is sufficient quantity for a three-digit ZIP code area to fill a sack approximately one-third full, the mailer must place the pieces in a sack labeled for the area.
   "(ii) If the pieces remaining after the three-digit sort for any State are sufficient to fill a sack approximately one-third full they must be placed in a sack labeled for the State.
   "(iii) All pieces remaining after the State sacks have been prepared, must

be placed in sacks labeled "Mixed States."
   "(iv) The total weight of pieces placed in one sack must not exceed 80 pounds."

6. A second part of the regulation, effective January 15, 1969, will require that non-identical pieces in quantities of 1,000 or more also be merged for mailing by states.

7. It is undisputed that the Post Off'ce defines "identical," for purposes of this regulation, as meaning books of the same title. Two books with different titles but otherwise having the same size and weight are not considered "identical."

rates when only Congress can alter rates.

Finally, plaintiffs argue that the regulation is unconstitutional in that it applies arbitrarily and discriminatorily to large book mailers like themselves who mail thousands of copies of a single title at a time but does not apply to book mailers whose mailings, while similar in overall volume, consist of .many titles, few or none of which are shipped in quantities exceeding 1,000 in any single day.

Plaintiffs' complaints also raised three additional grounds for challenging the regulation: (1) that it was adopted without observance of the necessary procedural requirements; (2) that it results in a taking of plaintiffs' property without due process of law; and (3) that it constitutes an unconstitutional transfer of official and quasi-official postal functions to unauthorized persons (plaintiffs). These three grounds were not pressed either in oral argument or elsewhere in the record. The Court considers them to be totally without substance on the present state of the record.

■ As a prerequisite to the issuance of a preliminary injunction the plaintiffs must show that they will suffer "certain and irreparable" injury if relief is not granted, and that there is a reasonable probability that they will ultimately prevail in the litigation. Ohio Oil Co. v. Conway, 1929, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972; Celebrity, Inc. v. Trina, Inc., 1959, 1 Cir., 264 F.2d 956, 958; Love v. Atchison, T. & S. F. Ry. Co., 1911, 8 Cir., 185 F. 321, 331–332, cert. denied, 1911, 220 U.S. 618, 31 S.Ct. 721, 55 L.Ed. 612; Ikirt v. Lee National Corporation, 1966, 3 Cir., 358 F.2d 726, 727.

The evidence shows that the plaintiffs have three available courses of action:

(1) The plaintiffs may at their own expense employ and train their own personnel to perform the tasks [8] of pre-sorting and sacking required by the regulation. The Department, however, does not undertake to reimburse the plaintiffs for the money thus expended, should they finally succeed in this litigation.

(2) The Post Office Department is authorized to enter into an agreement to perform the required pre-sorting and sacking services at the plant of either plaintiff provided such plaintiff agrees to pay the Post Office Department the sum of $4.50 for each postal man-hour expended at the plaintiff's plant. The Department, however, does not undertake to refund the money thus paid by the plaintiff in the event the plaintiff ultimately prevails on the merits.

(3) The plaintiffs can avoid the pre-sorting and sacking requirements of the regulation by mailing their book club shipments at the higher regular fourth-class rates, as opposed to the special fourth-class rates. If the plaintiffs choose to follow this third alternative the Department would undertake to refund the difference in postage between regular fourth-class and special fourth-class rates should the plaintiffs prevail on the merits. The Department's willingness to do this is shown by the affidavit of Assistant Postmaster General, Bureau of Operations, filed by the defendants which contains the following statement:

"(2) [(20)] Should any mailer litigating section 135.2(a) (6) pay the regular third or fourth-class rates under protection in lieu of complying with section 135.2(a) (6), the Department will make a refund of the difference in postage if it is ultimately determined such mailer did not have to comply with section 135.2(a) (6)."

Reference to "regular fourth-class rates" in the foregoing statement means "Fourth class (parcel post) zone rates" set forth in 39 C.F.R. § 135.1(a) and amendments thereto.[9]

---

8. The tasks involved are relatively simple. Training new personnel to perform these tasks should not present any difficulty.

9. See "Defendants' Response to Order of Court of November 15, 1968."

The Court relies on the affidavit. The Court has no reason to assume that the Department would not honor its commitment.

■ In view of the availability to the plaintiffs of the third alternative course of action, the Court is not persuaded that the enforcement of the regulation pending final determination of the litigation would cause irreparable injury to either of the plaintiffs.

■ An additional factor to be weighed is whether there is a reasonable likelihood that the plaintiffs will prevail on the merits. Unicon Management Corp. v. Koppers Co., Inc., 1966, 2 Cir., 366 F.2d 199, 204; Continental Oil Co. v. Frontier Refining Co., 1964, 10 Cir., 338 F.2d 780, 781; Crane Co. v. Briggs Manufacturing Co., 1960, 6 Cir., 280 F. 2d 747, 749; Community Chevrolet, Inc. v. General Motors Corporation, 1965, D. Mass., 248 F.Supp. 390, 395. The rule has been stated in these words,

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

Hamilton Watch Co. v. Benrus Watch Co., 1953, 2 Cir., 206 F.2d 738, 740.

■ On the evidence presently before me I am not satisfied that the plaintiffs' objections to the regulations meet this test. The contention that the regulation results in a disguised postal rate increase simply because compliance with the regulation requires plaintiffs to incur some expense which they would not otherwise incur is not persuasive. Such reasoning, if accepted, would invalidate virtually every existing postal regulation governing standards of mailability and would saddle Congress with the impossible task of regulating in minute detail by statute the multifarious activities of a vast governmental department.

The argument that the Postmaster General abused the authority vested in him by Congress when he defined a "single mailing" to include all identical items presented in a single day is equally tenuous. The use of some unit of time in defining a single mailing is not only reasonable but virtually essential, particularly in an industry where some mailers—like Colonial—literally present their mailings on a continuous conveyor belt. Any definition based solely upon the number of items presented simultaneously for mailing would be easily circumvented by bulk mailers through the simple practice of submitting an unlimited number of successive bulk mailings as long as, in each instance, the number of items in each installment fell below the number used to define a "mailing." In view of the broad authority granted to the Postmaster General to define a "single mailing," this Court does not see how on the present state of the record plaintiffs' arguments on this point are reasonably likely to succeed.

The efficient and reasonably economical operation of a public enterprise as complex as the Post Office Department requires the delegation of broad discretionary powers to the officials charged with the responsibilities of administration. It does not appear from the evidence thus far presented to the Court that the powers delegated by the statute to the Postmaster General have been exceeded or are being improperly exercised.

Plaintiffs' contention that the regulation applies discriminatorily to them but not to other large-volume book mailers is not substantiated by the evidence presently before the Court. All regulations establishing standards must necessarily affect some mailers but not others whose businesses involve different factors and require a different method of operation. The Court is of the opinion that, on the present state of the record, it does not reasonably appear that plain-

tiffs are likely to succeed on the merits with this argument.

For these reasons, plaintiffs' applications for temporary restraining orders and preliminary injunctions are denied.